UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ROBERT A. NICHOLS,           :
                             :
          Plaintiff,         :
                             :
v.                           :           No. 2:14cv50
                             :
CAROLYN W. COLVIN,           :
Acting Commissioner of Social Security,  :
                             :
          Defendant.         :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Robert Anthony Nichols ("Nichols") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. Specifically, Nichols claims that the Administrative Law Judge ("ALJ") failed to properly weigh the medical evidence in assessing Nichols' residual functional capacity, that the ALJ failed to properly evaluate Nichols' credibility, that the ALJ relied on flawed vocational expert testimony, and that new evidence warrants this Court's remand to the ALJ for further proceedings. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the undersigned recommends that the final decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

Nichols applied for DIB on September 20, 2010 and alleged that he was disabled as of March 23, 2010. (R. 144.) The Commissioner denied his application initially, (R. 82) and upon

1

reconsideration. (R. 97). Nichols then requested an administrative hearing, which an ALJ held on August 2, 2012. (R. 46).   On August 31, 2012, the ALJ concluded that Nichols was not disabled within the meaning of the Social Security Act and denied his claim for DIB. (R. 43). The Appeals Council denied Nichols' request for review of the ALJ's decision, (R. 1), thereby making the ALJ's decision the final decision of the Commissioner.   Pursuant to 42 U.S.C. § 405(g), Nichols filed this action seeking judicial review of the Commissioner's final decision. The case is now before the Court on the parties' cross-motions for summary judgment and Nichols' alternative motion for remand.

## II. FACTUAL BACKGROUND

Nichols was forty-nine years old on his alleged onset date and fifty-two when the ALJ rendered his decision. (R. 43, 144). He is approximately 5' 7" and 210 pounds. (R. 54). Historically, he as has worked on boats in various capacities.   Nichols also has a high school diploma. (R. 55). He worked at Norfolk Marine Company for approximately ten years, but was laid off in March 2010 because "[he] just – [he] couldn't do the job anymore." (Nichols' Test. before ALJ, R. 51). His work in that job consisted of rigging boats and warehouse work, but his duties were primarily in fiberglass and gelcoat work. Id. His job involved applying grinders to boats' hulls, which at times required Nichols to work on his back underneath boats. (R. 52.) Nichols claims that he was unable to work as of March 23, 2010. (R. 144-51).

The medical evidence of record begins on March 7, 2009 when Nichols was admitted to Norfolk General Hospital from police custody for alcohol detoxification and to address suicidal ideation. (R. 255). His blood alcohol content was 0.25%. Id. The doctor, Robert Camp, M.D., noted Nichols' diagnoses of hepatitis C and chronic alcohol abuse. Id. Nichols reported that he had been smoking approximately a pack of cigarettes per day and consuming "huge quantities"

2

of alcohol, such as a case of beer in the day followed by a half gallon of wine at night. Id.  His

ongoing diagnoses included: chronic alcoholism superimposed on known hepatitis C, with

patient dissociating and having suicidal ideation; hemorrhoids and some sigmoid diverticula;

bilateral rotator cuff injuries; and an element of underlying chronic obstructive pulmonary

disease. (R. 257).  Nichols was admitted on an alcohol withdrawal protocol. (R. 257).

Four days later, Nichols was transferred to the psychiatric unit for evaluation. (R. 257-

58).  There, Robert T. Light, M.D., noted that Nichols had a long history of alcohol dependence

and was also in a "horrific accident in which he was found guilty of manslaughter charges." (R.

250).  Diagnoses included: major depressive disorder, recurrent; post-traumatic stress disorder

("PTSD"); alcohol dependence; and a GAF[1] of 60.  (R. 251).  Dr. Light discharged Nichols on

March 12, 2009 because he was no longer suicidal.  Discharge diagnoses included: PTSD,

alcohol dependence, and a GAF of 65.  (R. 252).  Dr. Camp drafted a "to whom it may concern"

note on March 11, 2009, and stated that Nichols had been hospitalized but "should be able to

return to full/unrestricted work by 3/16/09." (R. 313).

On December 19, 2009, EMS personnel brought Nichols to the emergency room due to

alcohol intoxication. (R. 291).  Upon physical examination, his back was non-tender; his upper

extremities were normal to inspection; his lower extremities showed no edema or calf

tenderness; distal pulses were intact; his reflexes were 2/4 and symmetric; his strength was 5/5

---

[1] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id.  However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

and symmetric; and sensation was intact. (R. 292). Nichols reported to doctors that he had a job, but "cannot stop drinking." (R. 292).

On March 18, 2010, Nichols was seen for an initial evaluation at Tidewater Psychotherapy Services. (R. 329-30). According to Tidewater's initial evaluation, Nichols was seeking treatment for his alcohol dependence following a recent three-day hospital stay at Riverside Hospital. (R. 329). He reported having attempted suicide by drug overdose after drinking wine. Id. He took a patient health questionnaire, and the results were "suggestive of a moderately severe depression." Id. The evaluator reported that he talked spontaneously, at a normal pace, with no apparent speech abnormalities; his attitude was cooperative; his mood appeared depressed with sad affect, but was appropriate to content; he was oriented in all spheres; his thinking appeared goal-directed and relevant, without any signs of thought disorder or unusual or bizarre thought content; his attention, short-term memory, and thought organization appeared intact, although his long-term memory appeared vague; his judgment and insight appeared adequate; and his intelligence appeared somewhat below average. (R. 330). Nichols was provisionally diagnosed with possible bipolar disorder. Id.

On March 21, 2010, Nichols again was admitted to the hospital as a result of a suicide attempt via "left wrist/forearm slashing." (R. 302). Upon discharge three days later, he was stable and non-suicidal. Doctors planned to follow up with him in one week and the surgery department would see him about any injury to the tendons in his left wrist from the cutting. Id. Nichols was laid off from his job at Norfolk Marine sometime in March 2010. (R. 51).

On March 25, 2010, Nichols was admitted to the Partial Hospitalization Program at Virginia Beach Psychiatric Center. (R. 314). In the record there, Mark T. Schreiber, M.D., the attending physician, recounted Nichols' history of detoxing at Norfolk General Hospital and

alcohol dependence. A physical examination revealed that Nichols was "well developed, well nourished . . . and in no acute distress." (R. 321). Nichols denied any ongoing physical problems and stated that he felt well. (R. 320). A mental status examination revealed that Nichols' speech and psychomotor activity were reduced; his mood and affect were somewhat anxious and depressed; he had no hallucinations, delusions, or ideas of reference or control; there was no thought, plan, or intent to harm himself or others; he was not a danger to himself or others; there was no evidence of a formal thought disorder; and his intellectual functioning was average. (R. 314-15). Dr. Schreiber noted that Nichols was intelligent, in good physical health, and cooperative and motivated for treatment, but also a "frequent relapser." (R. 315). Admission diagnoses included: alcohol dependence; major depression, recurrent, severe with suicidal features; generalized anxiety disorder; and a GAF of 40-50, although his highest GAF in the past year was a 70-80. (R. 315). Upon his discharge, Dr. Schreiber noted Nichols was less anxious and depressed, more focused, cheerful, optimistic and bright, and doing well with groups and meetings. (R. 316). Nichols returned to Tidewater to see Robert Daniel, Ph.D. on April 6, 2010 and later attended group therapy sessions there. See (R. 323-27).

On April 29, 2010, Dr. Camp signed another note addressed "to whom it may concern," in which Dr. Camp opined that Nichols was unable then, "or in the future, to perform his duties at work. He is deemed totally disabled." (R. 395). Dr. Camp noted Nichols' surgery to repair his rotator cuff injuries four years prior and stated that "[a]lthough post-op range of motion improved somewhat, it is still limited precluding active physical use. His left shoulder remains compromised with limited abduction secondary, in part, to significant pain, but, also to structural abnormalities." (R. 395).

From April 2010 through June 2011, Nichols continued to see Dr. Light at Hampton Roads Behavioral Health, P.C. See (R. 332-61). On June 1, 2010, Dr. Light assessed a GAF of 55 and noted that Nichols' compliance with treatment was good. (R. 345). On August 16, 2010 and September 13, 2010, Dr. Light assessed a GAF of 60 and noted that Nichols' compliance was good. (R. 353, 357). On October 19, 2010, Dr. Light assessed a GAF of 65. (R. 361). On November 11, 2010, Dr. Light assessed a GAF of 65 and noted that Nichols' compliance and progress toward specific goals was good. (R. 339). On February 3, 2011, March 17, 2011, April 28, 2011, and May 19, 2011, Dr. Light assessed a GAF of 65 and again noted that Nichols' compliance was good. (R. 332, 334-36). Dr. Light's assessments remained the same through June 16, 2011. (R. 337-38).

On October 22, 2010, Nichols completed a function report. (R. 195). Nichols reported letting the dog out, walking around the block, dusting, watching television, and preparing his own lunch daily. (R. 188-90). He also changed the cat litter, took the garbage out, and did laundry on a regular basis. Id. He checked the boxes to indicate that his injuries affected: lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, and concentration. (R. 193).

On January 16, 2011, Dr. Camp completed Nichols' counsel's "Multiple Impairment Questionnaire." (R. 363-70). Dr. Camp listed three diagnoses: bilateral rotator cuff tears with chronic pain and reduced range of motion, hepatitis C with hepatitis cirrhosis, and anxiety/depression. (R. 363). Dr. Camp asserted that the rotator cuffs limited Nichols' abduction of both upper extremities, and that increased abdominal girth with some ascites due to hepatic disease limited Nichols' stooping, bending, and sitting. (R. 363). Dr. Camp noted that Nichols was unable to abduct his shoulders to 90 degrees, use repetitive motion with the upper

extremities, or lift more than ten pounds due to pain. (R. 364). Dr. Camp found that Nichols could sit for three hours and stand/walk for one hour in an eight-hour day, and that he should get up and move around every hour. (R. 365). Dr. Camp rated Nichols' pain as moderately severe to severe and his fatigue as moderately severe. (R. 265). Dr. Camp also found that Nichols could lift or carry five to ten pounds occasionally and never lift or carry ten to twenty pounds, that he had significant limitations in doing repetitive reaching, handling, fingering, or lifting, and that he had marked limitations/was essentially precluded from grasping, turning, or twisting objects, using his fingers/hands for fine manipulations, and using his arms for reaching, including overhead. (R. 366-67). Dr. Camp concluded that Nichols could not do a full-time competitive job that required activity on a sustained basis and that he would experience pain, fatigue, or other symptoms severe enough to frequently interfere with attention and concentration. (R. 368). Dr. Camp also concluded that emotional factors contributed to the severity of Nichols's symptoms and functional limitations, and that he was incapable of even low-stress work. (R. 368). Dr. Camp also checked boxes that indicated that in a job setting, Nichols would need to avoid wetness, temperature extremes, and heights, and that he could do no pushing, pulling, kneeling, bending, or stooping. (R. 369).

Dr. Camp conducted a physical examination on May 3, 2011. (R. 393). Dr. Camp found that Nichols had limited abduction in both shoulders with biceps/triceps weakness and muscle loss, paraspinal muscle spasm, and a straight-leg raising test that was positive at 45 degrees. Dr. Camp doubted that Nichols would be capable of performing work requiring repetitive use of the upper/lower extremities. Id. Dr. Camp also wrote a letter on July 5, 2011 opining on Nichols' ability to work. (R. 392). After describing Nichols' rotator cuff injuries and liver problems, Dr. Camp asserted

> In short then, Mr. Nichols has done everything in his power to get back to work: Surgically, grueling physical therapy, job modification and, yes even taking periodic over the counter NSAIDS (by his own choice) despite their potential hepatotoxic effects with his underlying Hepatitis C. Something I, as his physician, cannot condone. Despite all of this, he has been told <u>by his employers</u> that he is not <u>physically</u> capable of fulfilling his duties. As his physical, condition is <u>not</u> expected to improve, but, rather, worsen with time and as there is no cure or stabilizing treatment, I, as the patient's physician, consider him <u>permanently</u> disabled.

(R. 392) (emphasis in original).  On an accompanying form, Dr. Camp checked the box indicating Nichols was "totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use [was] not a material cause of [Nichols'] disability." (R. 391).  Dr. Camp also checked the box that explained that his conclusion was made because Nichols' "use of drug and/or alcohol is insignificant and has no impact on his disability." (R. 391).

After his alleged onset date, it appears that Nichols worked as a delivery driver for a thrift store in Norfolk for three days in May 2011. (R. 229).  Nichols also worked for Ocean Marina doing fiberglass repair and painting for one week in June 2011. (R. 229).  Nichols testified that he was "let go" from both of these jobs because of his physical inability to perform the requisite duties. (R. 51).

In August 2011, Nichols completed another function report. (R. 211).  He still reported letting the dog out daily, driving, making his own lunch, doing laundry once per week, and cleaning the house every three days. (R. 205-06).  He could not perform yard work though, because it was "hard on [his] knees." (R. 207).  He also blamed his knees for limiting his abilities. (R. 209) ("My knees effect [sic] everything.").  In addition to the boxes he checked in October 2010, Nichols additionally indicated that his injuries affected his sitting, talking, hearing, seeing, completing tasks, and getting along with others. (R. 209); <u>cf.</u> (R. 193).

Ten days later, Nichols completed another function report. (R. 219). It was almost entirely the same as the previous one. He stated, "yard work is to [sic] bad on feet, legs, knees [and] arms." (R. 215). This time, Nichols did not check the boxes to indicate that his injuries affected his hearing, talking, seeing, or ability to get along with others. (R. 217).

On September 7, 2011, Ralph Hellams, M.D., a state agency medical consultant, completed a physical RFC assessment based upon his review of the record. See (R. 90-91). Dr. Hellams found that Nichols had the RFC to perform medium work. He could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull without limitation except at shown for his ability to lift and/or carry. (R. 90, 95). Dr. Hellams also found that Nichols had no postural, manipulative, visual, communicative, or environmental limitations. (R. 91).

On September 9, 2011, Alan D. Entin, Ph.D., a state agency psychological consultant, completed a Mental RFC Assessment based upon his review of the record. (R. 91-93). Dr. Entin found that Nichols had the mental RFC to perform simple, routine work. (R. 95).

Before the ALJ, Nichols testified that a large portion of his daily pain derives from his Hepatitis C. (R. 61). Nichols reported constant pain on his "left side, where the liver is." (R. 61). Nichols rated the liver pain at six to seven on a ten point scale, and he rated his shoulder pain about five to six. (R. 61). Nichols testified that he did a little bit of cooking and helped out with the laundry. (R. 52). He stated he was able to drive, but rarely did. He testified that he could not stand for long periods of time, but he had no problems sitting for long periods of time. (R. 53). He stated that he could walk about one half of a city block before having to stop and rest, and could lift or carry no more than fifteen pounds. (R. 53).

A vocational expert ("VE") also testified before the ALJ.  The VE classified Nichols' past fiberglass work and boat rigging work as medium and semi-skilled.  (R. 62).  He classified Nichols' boat building and repairing work as medium, skilled.  Id.  The VE classified his dredging and dock building work as heavy and skilled.  Id.  The VE testified that a hypothetical individual with Nichols' vocational profile who could lift/carry and push/pull up to twenty pounds occasionally and ten pounds frequently from waist to chest level; would need to avoid overhead work activity; could stand and walk for 6 hours within an eight-hour workday; could sit for six hours within an eight-hour workday; should avoid climbing ladders, ropes, and scaffolds; should avoid crawling; could perform other postural movements occasionally; should avoid constant fingering, handling, grasping, and reaching; would be limited to simple routine, low-stress (defined as avoid production-quota work and minimal changes in the work routine and minimal decision-making); and would be limited to brief superficial contact with the public and coworkers, could not perform Nichols' past relevant work.  The VE testified that such an individual could though perform the light unskilled jobs of unarmed security guard, office helper, and mail clerk, which exist in significant numbers in the national economy.  (R. 63-64).  The VE also testified that these jobs exist in reduced, but significant numbers with an added fifteen to thirty-minute sit/stand option.  (R. 64-65).  The VE testified that if Nichols' testimony before the ALJ was taken as fully credible, then he would not be able to perform any work in the national economy.  (R. 65).

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g);

Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under the prescribed retirement age, file an application for disability insurance benefits, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A).  To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability.  See 20 C.F.R. § 1520(a)(3).  The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.  The ALJ must answer:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from performing other jobs existing in significant numbers in the national economy?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.  An affirmative answer to question three or five establishes disability.  See id. §§ 1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.

1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

### A. The ALJ's Decision

As a result of his five-step analysis, the ALJ concluded that Nichols met the insured status requirements, but had not been under a disability within the meaning of the Social Security Act between Nichols' alleged onset date, March 23, 2010 and his decision on August 31, 2012. (R. 43). At step one, the ALJ found that Nichols had not engaged in substantial gainful activity since his alleged onset date, March 23, 2010. (R. 35). At step two, the ALJ found that Nichols suffered from the following severe impairments: affective disorder, anxiety related disorder, disorders of the shoulders and knees, and liver disease. (R. 35). At step three, the ALJ found that Nichols did not suffer from a listed impairment. (R. 36). At step four, the ALJ found that Nichols could not perform his past relevant work because of his impairments. (R. 42). In drawing his step four conclusion, the ALJ determined that Nichols had a residual functional capacity ("RFC") to perform light work involving lifting, carrying, pushing, and pulling up to twenty pounds occasionally and ten pounds frequently from waist to chest level (avoiding overhead work activity); standing and walking about six hours and sitting for six hours in an eight-hour workday; avoiding climbing ladders/ropes/scaffolds and crawling, but involving no more than occasional other postural movements; avoiding constant fingering, handling, grasping,

and reaching; and from a mental standpoint, limited to simple, routine, low stress (defined as avoiding production quota work such as assembly line jobs, work having minimal changes in routine and minimal decision making) tasks with brief superficial contact with the public and co-workers . (R. 37-38). At step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Nichols can perform. (R. 42).

### B. The ALJ Properly Considered and Explained the Weight Given to Nichols' Treating Physician's Opinions.

Nichols argues that the ALJ failed to give proper weight to Dr. Camp's opinions in determining Nichols' RFC. Determining whether a claimant is disabled is the sole the responsibility of the Commissioner, and opinions on this issue are not entitled to special significance. 20 C.F.R. § 404.1527(d). In determining a claimant's RFC and thus, whether he is disabled, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. Id. § 404.1527(c).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. § 404.1527(c)(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be

accorded significantly less weight." Craig, 76 F.3d at 590. In such a case, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.); see also 20 C.F.R. § 404.1527(c). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. 20 C.F.R. § 404.1527(c)(2).[2]

Here, the ALJ addressed and assigned weight to three distinct documented opinions offered by Nichols' treating physician, Dr. Camp. First, the ALJ gave no weight to Dr. Camp's opinion, expressed in notes/letters dated April 29, 2010 (R. 395), and July 5, 2011 (R. 392), that concluded that Nichols was totally and permanently disabled because of Nichols' muscoskeletal impairments, degenerative joint disease, and bilateral shoulder pain following his rotator cuff surgery. (R. 41). Second, the ALJ gave little weight to Dr. Camp's opinion contained in his responses to the Multiple Impairment Questionnaire, (R. 363-70), because "it is an overestimate of the claimant's functional limitations as compared with his conservative treatment history since the alleged onset date, the lack of objective findings of abnormality, his activities of daily living,

---

[2] In addition, under the applicable regulations, the ALJ must "explain" in his decision the weight accorded to all opinions – treating sources, non-treating sources, state agency consultants, and other non-examining sources. 20 C.F.R. § 404.1527(e)(2)(ii); see also Brewer v. Astrue, No. 7:07-CV-24, 2008 WL 4682185, at *3 (E.D. N.C. Oct. 21, 2008) ("While an ALJ may not reject medical evidence for no reason or for the wrong reason, see King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.").

and demonstrated functional capacity with regard to gait, station, coordination." (R. 41 (citing SSR 96-2p). Third, the ALJ gave no weight to Dr. Camp's statement in an earlier note that Nichols could return to full-time unrestricted work by March 16, 2009. (R. 313).

On appeal, Nichols appears to only claim error with respect to the ALJ's assessment of Dr. Camp's opinions contained in the Multiple Impairment Questionnaire provided by Nichols' counsel that Dr. Camp completed on January 16, 2011. See Pl.'s Br. (ECF No. 10, at 13); (R. 363-70). Because the ALJ sufficiently articulated why he accorded Dr. Camp's opinions in the Multiple Impairment Questionnaire little weight, the undersigned finds no error in the ALJ's analysis. To the extent that Nichols alleges error with respect to the ALJ's treatment of Dr. Camp's two other pieces of opinion evidence, it is clear that those were not medical opinions as described in the regulations, but rather "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d).

As an initial matter, Dr. Camp is indeed a treating physician. That is, he is a physician who has observed Nichols' condition over a prolonged period of time. Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983); see (R. 395) (asserting that he has seen Nichols since June 2000). However, his opinions manifested through his answers to the Multiple Impairment Questionnaire were "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ supported his allocation of little weight to that opinion by citing substantial countervailing evidence.

The ALJ specifically considered Dr. Camp's clinical findings based upon examinations of Nichols in both determining Nichols' RFC and according weight to Dr. Camp's later opinions found in the Questionnaire. See (R. 39, 41). The ALJ noted that in April 2010, just after Nichols' alleged onset date, Dr. Camp reported that Nichols had a limited range of motion,

progressive pain, weakness, and limited abduction in the left shoulder due to pain and structural abnormality. (R. 39 (citing R. 393-95)).  The ALJ explained that these findings were consistent with Dr. Camp's physical examination performed in the emergency room in March 2009.  (R. 39); see (R. 256).  However, the ALJ also found that the severe pain documented by Dr. Camp in January 2011 was inconsistent with Dr. Williams' notes and assessment of October 2010, which showed that Nichols' pain was moderate in severity and he presented in no acute distress.  (R. 39, 365, 409).  The ALJ explained that a restriction in his RFC (avoiding overhead lifting and reaching) allowed for Nichols' "frozen shoulders."  (R. 37-39).

The ALJ also cited Nichols' own testimony about his daily living activities as further evidence inconsistent with Dr. Camp's Questionnaire opinions.  (R. 41).  For example, Dr. Camp opined that Nichols was "essentially precluded" from "using fingers/hands for fine manipulations."  (R. 367).  Nichols testified that he enjoyed drawing daily, (R. 59-60), and had no problem picking up small objects like pen and paper.  (R. 54).  It appears the extent of his "marked limitation" with his hands is greater difficulty opening jars than in the past.  (R. 54, 367).  Nichols also testified, and the ALJ discussed, that he did laundry on a weekly basis, let his dog out, and read daily.  (R. 41, 59).  Similarly, Dr. Camp opined that Nichols could "occasionally" lift and carry five to ten pounds and "never" lift or carry ten to twenty pounds. (R. 366).  Nichols testified that he could lift or carry up to fifteen pounds.  (R. 53).

The ALJ also cited Nichols' conservative treatment history since the alleged onset date as further diminishing the weight assigned to Dr. Camp's opinions.  (R. 41); see, e.g., Harris v. Colvin, No. 7:13cv24, 2014 WL 4749110, at *4 (W.D. Va. Sept. 23, 2014) (holding that a conservative treatment history discounted claimant's testimony about the severity of her limitations).  Indeed, it does not appear that Dr. Camp has prescribed any medication or

treatment to ameliorate Nichols' physical symptoms.  See (R. 367) (leaving blank the space for list of medications).   This is due in part to Nichols' liver's inability to handle analgesic medication, which is due in part to the lack of treatment for his Hepatitis C and cirrhosis because of his failure to cease alcohol consumption.  See (R. 412) (Dr. Williams noting that Nichols had been using no medication or treatment for his cirrhosis and Hepatitis C and that symptoms "have been associated with ongoing alcohol ingestion"); see also 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); 20 C .F.R. § 404.1535(a).

The ALJ's conclusion that Dr. Camp's Questionnaire responses were an "overestimate" was supported by substantial evidence.[3]   The ALJ evaluated the "supportability" and "consistency," 20 C.F.R. § 404.1527(c)(3), (4)[4] of Dr. Camp's opinions.  Even though Plaintiff argues that the ALJ failed to follow certain directives from SSR 96-8p and failed to cite "other evidence", see Pl.'s Br. (ECF No. 10, at 16), the Fourth Circuit has recently reiterated that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Reid v. Comm'r of Social Security, __ F.3d __, 2014 WL 4555249, at *3 (4th Cir. July 2, 2014). The statute providing for judicial review merely requires that "the Commissioner's decision . . . 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it

---

[3] Moreover, the nature of check-the-box questionnaires limits their value to the Commissioner.  See Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").  Where a treating source provides a better explanation of his opinion, that opinion will receive greater weight. 20 C.F.R. § 404.1527(c)(3).

[4] It also does not appear that Dr. Camp is a specialist.  This factor lends further support to the ALJ's weight assignment under the regulations.  See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

is based.'" Id. (quoting 42 U.S.C. § 405(b)(1)).    Because he fully explained why he accorded

the questionnaire responses lesser weight under the regulations' factors, the ALJ's decision was

supported by evidence that "a reasonable mind might accept as adequate to support [his]

conclusion."    Richardson v. Perales, 402 U.S. at 401 (defining "substantial evidence").

Therefore, the ALJ committed no reversible error in assigning little weight to Dr. Camp's

opinions.

### C. The ALJ Properly Assessed Nichols' Credibility

Nichols next argues that the ALJ failed to properly evaluate his credibility.   The ALJ

concluded that Nichols' impairments could reasonably be expected to cause the alleged

symptoms, but his statements concerning the intensity, persistence, and limiting effects of those

symptoms were only partially credible.   (R. 38-39). Nichols argues that the ALJ's credibility

analysis simply mirrors his analysis of Dr. Camp's opinion and is too "marginal" to withstand

substantial evidence review. Pl's Br. (ECF No. 10, at 18).  The undersigned finds that the ALJ's

credibility assessment was supported by substantial evidence.

When the ALJ assesses the credibility of a claimant's subjective complaints of pain or

other symptoms, the ALJ engages in a two-step process.   First, the plaintiff must satisfy a

threshold obligation of showing, by objective medical evidence, a medical impairment

reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at

594-95. "[W]hile a claimant must show by objective evidence the existence of an underlying

impairment that could cause the pain alleged, 'there need not be objective evidence of the pain

itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir.

1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect his ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including his own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. § 404.1529(c)(3).

Importantly, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Eldeco, Inc. v. N.L.R.B., 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir. 1983)). "Exceptional circumstances" are those where the ALJ's determination is "unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." Id.

Here, the ALJ cited ample evidence in the record to make his credibility determination. The ALJ considered a plethora of evidence to weigh against Nichols' testimony about the intensity, persistence, and functional limitations of his symptoms. He stated that he considered

> not only the objective medical evidence, but [Nichols'] medical history, the character of his symptoms, precipitating and aggravating factors, the type of treatment used to relieve his pain/symptoms, his response to medications and treatment, his restricted daily activities, his work history and how past jobs ended, and the statements of treating and examining sources regarding the nature and severity of his overall condition.

(R. 39). And, "absent evidence to the contrary, we take [the Commissioner] at her word." Reid v. Comm'r of Soc. Sec., __ F.3d __, 2014 WL 4555249, at *4 (4th Cir. 2014) (citing Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005)). Moreover, the ALJ did specifically cite Nichols' conservative treatment history and his extensive daily activities as evidence that rendered Nichols' subjective complaints "less than fully credible." (R. 41); see Harris, 2014 WL 4749110, at *4 (holding that a conservative treatment history discounted claimant's testimony about the severity of her limitations).

Further, the ALJ's conclusion from Nichols' function reports that Nichols "is independent in personal care" is supported by ample evidence in the record. (R. 41). Nichols' function reports sketch a fairly clear picture of a claimant who can take care of himself and perform the type of work described in the ALJ's RFC. Nichols reported letting the dog out, walking around the block, dusting, watching television, and preparing his own lunch daily. (R. 188-90). He also changed the cat litter, took the garbage out, and did laundry on a regular basis. Id. Moreover, Nichols testified that a large portion of his daily pain derives from his Hepatitis C. (R. 61). Nichols reported constant pain on his "left side, where the liver is." (R. 61). As discussed above, Nichols has had a documented conservative, or really non-existent, treatment of his liver diseases because of his refusal or inability to abstain from alcohol. See, e.g., (R. 412).

Additionally, the ALJ pointed out several inconsistencies within the record that weighed against Nichols' testimony. Nichols' testimony was inconsistent with: the opinion of the state agency psychological consultant, (R. 37), Dr. Williams' clinical findings, (R. 39), Dr. Schreiber's clinical findings, (R. 40), and Dr. Light's clinical findings, including GAF scores, which improved to a 65 by November 2010. (R. 40). As such, the ALJ's determination was not "unreasonable, contradict[ory of] other findings of fact, or [] based on an inadequate reason or no

reason at all." Eldeco, Inc., 132 F.3d at 1011. The ALJ's credibility determination was supported by substantial evidence.

### D. The ALJ Properly Considered the Vocational Expert's Testimony

Nichols next argues that the ALJ relied on flawed testimony from the VE in two respects. Nichols' first argument is contingent upon his above arguments. He argues that because the ALJ's RFC was flawed, his hypothetical questions posed to the VE based on that RFC are inadequate to show that there are jobs that Nichols can perform in the national economy. See, e.g., Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (holding that the ALJ's hypotheticals to the VE must "fairly set out all of claimant's impairments"). Because the undersigned found no error in the ALJ's evaluation of the medical evidence and Nichols' credibility, Nichols' argument here also fails. With no error in the ALJ's RFC determination, the ALJ properly elicited and considered the VE's testimony based on the RFC determination.

Nichols' second argument with respect to the VE's testimony is that the ALJ failed to address conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). Social Security Regulations provide that "when there is an apparent unresolved conflict between [VE] evidence and the [DOT], the adjudicator must elicit a reasonable explanation for the conflict . . ." and "resolve the conflict by deciding if the [VE's] explanation for the conflict is reasonable." Fisher v. Barnhart, 181 Fed. App'x 359, 365 (4th Cir. 2006) (unpublished per curiam); SSR 00-4p; 2000 WL 1898704, at *2 (noting that the DOT and testimony of the VE should typically be consistent). Thus, before relying on the VE's testimony to make a disability determination, the ALJ must resolve any apparent conflict. Id.

Relevant to Nichols' appeal, the ALJ asked the VE about a hypothetical person limited to "simple routine, low-stress" work with "minimal decision-making." (R. 63). In response, the

VE gave three examples of light jobs consistent with those limitations: unarmed security guard, office helper, and mail clerk. (R. 64). The ALJ inquired if the VE's testimony was consistent with the DOT. The VE testified: "It is, except the unarmed security job is given as a light, semi-skilled, SVP 3 job in the DOT. But based on my work experience as a vocational rehabilitation counselor, I have identified it existing as a light, unskilled job in the numbers given that meets the hypothetical." (R. 64). Nichols did not object at the hearing, but he later objected to the three positions offered by the VE as inconsistent with the ALJ's hypothetical, in a letter to the ALJ on August 9, 2012. (R. 437-38). He argued that the Reasoning Levels assigned to those jobs by the DOT exceed what the ALJ provided for in his hypothetical. (R. 438). Office helper was level two, which requires the ability to "apply common sense understanding to carry out detailed, but uninvolved written or oral instructions." (R. 437). The other two are level three, which requires the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. [And] [d]eal with problems involving several concrete variables in or from standardized situations." DOT, App'x C, available at http://www.lb7.uscourts.gov/documents/INSD/08-1621.pdf.

Ruling 00-4p provides a "clear remedy" for any inconsistency between the VE's testimony and the DOT – "reconciliation by reasonable explanation." Fisher, 181 F. App'x at 366. Moreover, "Ruling 00–4p acknowledges . . . that neither the Dictionary of Occupational Titles nor the vocational expert's testimony 'automatically 'trumps' when there is a conflict.'" Id. at 365 (quoting SSR 00-4p). Likewise, the Fourth Circuit "has declined to place an obligation on the ALJ to uncover conflicts between VE and DOT evidence, but requires the ALJ to inquire if discrepancies between a VE's testimony and the DOT exist and to resolve such discrepancies." Stuckey v. Colvin, No. 2:12cv386, 2013 WL 6185837, at *3 (E.D. Va.

November 25, 2013) (citing Justin v. Massanari, 20 F. App'x 158 (4th Cir. 2001)). "Once the ALJ fulfills its 'affirmative responsibility' to inquire about possible conflicts and, if necessary, resolve reasonably explained conflicts, the ALJ may accept the VE's testimony in its consideration of whether there is substantial evidence of disability." Id. (quoting Brock v. Astrue, 2007 WL 4287721 (E.D. N.C Dec. 5, 2007)).

Here, the ALJ properly inquired about consistency and provided a reasonable explanation for the inconsistency. Cf. Myers v. Astrue, No. 4:11cv62, 2012 WL 4479971, at *5 (E.D. Va. Sept. 28, 2012) (finding reversible error where the ALJ merely asked if the VE's testimony conflicted, "but failed to probe the VE's assertion that it did not"). During the hearing, he specifically asked the VE if his testimony was consistent with the DOT. (R. 64). Then, the VE explained that it was, except for the adjustment he made for the security guard numbers, based on his work experience as a vocational rehabilitation expert.[5] The VE went on to discuss the specific duties required of an unarmed security guard in the region. (R. 64). As the ALJ noted in his decision, the VE "testified that he reduced the numbers of positions as unarmed security guard based on his work experience" to accommodate the limitations the ALJ expressed in his hypothetical. (R. 43). Indeed, the DOT lists the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in

---

[5] Additionally, the inconsistency appears to be minimal. The Commissioner's regulations provide that "[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568(a). Each job identified in the DOT has a specific vocational preparation ("SVP") time. An "SVP 1" indicates that a "[s]hort demonstration only" is needed to learn the job, and an "SVP 2" indicates that "[a]nything beyond short demonstration up to and including 1 month" is needed to learn the job. Thus, an "SVP 1" or "SVP 2" would be consistent with "unskilled work" under the Commissioner's regulations. See 20 C.F.R. § 404.1568(a). The job of office helper has an SVP 2, 1991 WL 672232; the job of mail clerk has an SVP 2, 1991 WL 671813, and the job of security guard has an SVP 3, 1991 WL 673100, which the VE accounted for in his testimony. (R. 64).   At bottom, "unskilled work" "accounts for a limitation of following short, simple instructions." Snider v. Colvin, No. 7:12CV539, 2014 WL 793151, at *4 (W.D. Va. Feb. 26, 2014) (citing SSR 85–15).

specific settings. See SSR 00-4p. Ruling 00-4p recognizes that a "VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." Id. Here, the VE indeed provided more detailed information about the job duties of an unarmed security guard based on his observations as an expert.

Moreover, unlike the cases where the ALJ fails to address an apparent conflict, the ALJ here explicitly recognized in his decision that the VE's "testimony is inconsistent with the information contained in the [DOT]." (R. 43). By eliciting further testimony from the VE and providing a reasonable explanation for the conflict, the ALJ satisfied his obligation under the regulations. Moreover, the inconsistency was not great enough for Nichols to object during the hearing. See, e.g., Carey v. Apfel, 230 F.3d 131, 146-47 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."). Because the ALJ adequately addressed the inconsistency, his decision was supported by substantial evidence, and this assignment of error provides no basis for remand or reversal.

### E. Nichols' Post-Hearing Evidence Does Not Require Remand to the ALJ

Nichols' final argument on appeal is that the Court should remand his case in order for the ALJ to consider new evidence submitted to the Appeals Council. To justify remanding to the ALJ, the Plaintiff must establish that: (i) the evidence is "new," i.e., "not duplicative or cumulative," (ii) the evidence is material, (iii) the evidence relates to the period on or before the date of the ALJ's decision, and (iv) that there is good cause for the failure to submit the evidence before the Commissioner. Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-

96 (4th Cir. 1991); see also 42 U.S.C. § 405(g).[6] "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96 (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)). Here, Nichols' post-hearing evidence is neither material nor relevant to the period before the ALJ's decision.

Specifically, Nichols argues that a new opinion after the hearing by psychiatrist Prakish Ettigi, M.D. undermines the ALJ's decision such that it is not supported by substantial evidence. Nichols submitted a letter from Dr. Ettigi and a Psychiatric Impairment Questionnaire completed by Dr. Ettigi to the Appeals Council. However, the Appeals Council did not consider it because it concluded that Dr. Ettigi's opinions addressed a time after the ALJ's decision. (R. 2). As Nichols points out, Dr. Ettigi asserted in his Questionnaire responses that "the earliest date that the description of symptoms and limitations" in the Questionnaire applied to was March 2010. (R. 14). However, it appears that Dr. Ettigi had no contact with Nichols before April 2013. (R. 7-17). In his April 22, 2013 letter, Dr. Ettigi referred to Nichols' medical history, including his long history of alcohol and drug abuse and manslaughter charge, but did not state whether he had the opportunity to review any of Nichols' medical records. (R. 15-17). Dr. Ettigi specifically referred to Nichols' disposition and affect at the time of his April 2013 "interview." (R. 16). Dr. Ettigi concluded that Nichols was "currently" suffering from depression, recurrent type with PTSD and alcoholism, that Nichols scored a GAF of 55 "at the present time," and that he did not "believe that [Nichols] can currently work in any capacity and will not be able to do full time competitive work due to his ongoing disability . . . in the next 12 months." (R. 17). Thus, it does not appear that Dr. Ettigi's questionnaire responses were an historical opinion that pertained

---

[6] The Code section provides, in part: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. 405(g).

to Nichols' relevant period of alleged disability. Without establishing that the post-hearing evidence is relevant to the time period before the ALJ's decision, Nichols has failed to establish an essential element under 42 U.S.C. § 405(g)'s "additional evidence" provision. See Wilkins, 953 F.2d at 96 n.3. Therefore, he has not shown that remand is appropriate.

Furthermore, even if Dr. Ettigi's opinion is construed to apply to the relevant time period, there is no reasonable possibility that the ALJ would have changed his decision upon reviewing the Questionnaire responses and letter. That is, Dr. Ettigi's opinion is not "material" under 42 U.S.C. § 405(g). Wilkins, 953 F.2d at 96. Dr. Ettigi appears to have conducted a one-time interview and drawn the same or similar conclusions as the other doctors in the record. Diagnoses of depression, PTSD, and alcoholism are not new for Nichols and the ALJ. Rather, under Wilkins, those diagnoses are "duplicative and cumulative." 953 F.2d at 96; see (R. 252) (Dr. Light discharging Nichols on March 12, 2009 and diagnosing PTSD, alcohol dependence, and a GAF of 65); (R. 315) (Dr. Schreiber diagnosing alcohol dependence, major depression, recurrent, severe with suicidal features, generalized anxiety disorder; and a GAF of 40-50); (R. 363) (Dr. Camp diagnosing anxiety/depression). As with Dr. Camp's opinion, Dr. Ettigi's summary conclusion that Nichols cannot work addresses an issue reserved to the Commissioner and would be due no deference by the ALJ. 20 C.F.R. § 404.1527(d). In light of the balance of the record applicable to the relevant period, there is not a reasonable possibility that the ALJ's decision would change on remand. Therefore, the undersigned concludes that remand to consider Dr. Ettigi's opinion is unwarranted.

## V. **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court DENY Nichols' Motion for Summary Judgment (ECF No. 8) and Motion for Remand (ECF No. 9), GRANT the

27

Commissioner's Motion for Summary Judgment (ECF No. 11) and AFFIRM the final decision of the Commissioner.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of filing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/  
Douglas E. Miller  
United States Magistrate Judge

DOUGLAS E. MILLER  
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia  
November 7, 2014