

FILED
MAR 13 2015
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

ROBERT A. NICHOLS,

    Plaintiff,

v.

                                        Civil No. 2:14cv50

CAROLYN W. COLVIN,

    Acting Commissioner,
    Social Security
    Administration,
    Defendant.

## ORDER

In the instant suit, Plaintiff challenges the decision of the Commissioner of the Social Security Administration to deny his application for Disability Insurance Benefits. Plaintiff claims complete disability under the Social Security Act starting on March, 23 2010. This matter comes before the Court on Robert Nichols' ("Plaintiff") Objections to Magistrate Judge Douglas E. Miller's Report and Recommendation ("R&R"). For the reasons herein, the Court: (1) **ACCEPTS** the R&R, ECF No. 13; (2) **AFFIRMS** the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant"); (3) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 8; (4) **DENIES** Plaintiff's Motion for Remand, ECF No. 9; and (5) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 11.

### I.    FACTUAL BACKGROUND

#### A. Plaintiff's Background

Plaintiff was forty-nine years old on March 23, 2010, his alleged onset date, and fifty-two when the ALJ rendered his decision. (R. 43, 144). He is approximately 5' 7" and 210 pounds. (R. 54). Plaintiff has a high school diploma. He was formerly in the Navy, but he was discharged

because of a manslaughter conviction for driving drunk. Plaintiff has a long and volatile history of alcoholism, at times drinking "a case of beer a day followed by a half gallon of wine later that evening." (R. 255). Although Plaintiff has made attempts at abstaining from alcohol, he has frequently relapsed. It appears from the record that Plaintiff indicates he stopped drinking from February 2011 to June 2011, but there is no indication of his sobriety after that date. (R. 332–337).

Plaintiff lives with his wife, her daughter from a previous marriage, and the daughter's two children, who were approximately seven and eight years old at the time of his application. (R. 189, 329). His wife is a licensed practical nurse who works for a physician. (R. 329). Plaintiff stays home and watches the children while his wife and daughter are at work. (R. 189). During the day, he also watches TV, dusts, does the laundry once a week, and "walk[s] around the block." (R. 188, 191). Plaintiff makes sandwiches and noon every day and cleans the house every three days. (R. 190, 206).

Historically, Plaintiff has worked on boats in various capacities. (R. 55). He worked at Norfolk Marine Company for approximately ten years, but was laid off in March 2010 because "[he] just – [he] couldn't do the job anymore." (R. 51). His work in that job consisted of rigging boats and warehouse work, but his duties were primarily in fiberglass and gelcoat work. Id. His job involved applying grinders to boats' hulls, which at times required Plaintiff to work on his back underneath boats. (R. 52). Plaintiff claims that he was unable to work as of March 23, 2010. (R. 144–51). However, it appears from Plaintiff's own reports that he applied for and received unemployment compensation until at least two weeks after August 5, 2011. (R. 211).

### B. Medical History

The medical evidence of record begins on March 7, 2009 when Plaintiff was admitted to Norfolk General Hospital from police custody for alcohol detoxification and to address suicidal

2

ideation. (R. 255). His blood alcohol content was 0.25%. Id. Plaintiff's primary doctor, Robert Camp, M.D., noted Plaintiff's diagnoses of hepatitis C and chronic alcohol abuse. Id. Plaintiff reported that he had been smoking approximately a pack of cigarettes per day and consuming "huge quantities" of alcohol, such as a case of beer in the day followed by a half gallon of wine at night. Id. His ongoing diagnoses included: chronic alcoholism superimposed on known hepatitis C, with patient dissociating and having suicidal ideation; hemorrhoids and some sigmoid diverticula; bilateral rotator cuff injuries; and an element of underlying chronic obstructive pulmonary disease. (R. 257). Plaintiff was admitted on an alcohol withdrawal protocol. (R. 257). While at the hospital, Plaintiff was also treated by Dr. Alex Williams, a gastroenterologist, who performed a flexible sigmoidoscopy due to concerns of alleged rectal bleeding. (R. 264).

Four days later, Plaintiff was transferred to the psychiatric unit for evaluation. (R. 257–58). There, Robert T. Light, M.D., noted that Plaintiff had a long history of alcohol dependence and was also in a "horrific accident in which he was found guilty of manslaughter charges." (R. 250). Diagnoses included: major depressive disorder, recurrent; post-traumatic stress disorder ("PTSD"); alcohol dependence; and a GAF[1] of 60. (R. 251). Dr. Light discharged Plaintiff on March 12, 2009 because he was no longer suicidal. Discharge diagnoses included: PTSD, alcohol dependence, and a GAF of 65. (R. 252). Dr. Camp drafted a "to whom it may concern" note on March 11, 2009, and stated that Plaintiff had been hospitalized but "should be able to

---

[1] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

return to full/unrestricted work by 3/16/09." (R. 313).

On December 19, 2009, EMS personnel brought Plaintiff to the emergency room due to alcohol intoxication. (R. 291). Upon physical examination, his back was non-tender; his upper extremities were normal to inspection; his lower extremities showed no edema or calf tenderness; distal pulses were intact; his reflexes were 2/4 and symmetric; his strength was 5/5 and symmetric; and sensation was intact. (R. 292). Plaintiff reported to doctors that he had a job, but "cannot stop drinking." (R. 292).

On March 18, 2010, Plaintiff was seen for an initial evaluation at Tidewater Psychotherapy Services. (R. 329–30). According to Tidewater's initial evaluation, Plaintiff was seeking treatment for his alcohol dependence following a recent three-day hospital stay at Riverside Hospital. (R. 329). He reported having attempted suicide by drug overdose after drinking wine. Id. He took a patient health questionnaire, and the results were "suggestive of a moderately severe depression." Id. The evaluator reported that he talked spontaneously, at a normal pace, with no apparent speech abnormalities; his attitude was cooperative; his mood appeared depressed with sad affect, but was appropriate to content; he was oriented in all spheres; his thinking appeared goal-directed and relevant, without any signs of thought disorder or unusual or bizarre thought content; his attention, short-term memory, and thought organization appeared intact, although his long-term memory appeared vague; his judgment and insight appeared adequate; and his intelligence appeared somewhat below average. (R. 330). Plaintiff was provisionally diagnosed with possible bipolar disorder. Id.

On March 21, 2010, Plaintiff again was admitted to the hospital as a result of a suicide attempt via "left wrist/forearm slashing" and "acetaminophen overdose." (R. 302, 305). After Plaintiff was treated, Dr. Camp performed a physical examination of Plaintiff and found that his right upper extremity was "essentially normal," except for "some limitation of abduction in the

4

right shoulder region." (R. 308). Dr. Camp's examination also revealed "significant crepitus in both knees with small bilateral effusions" and a "bilateral Baker cyst." (R. 308). A CT scan of Plaintiffs head and cervical spine "showed no acute injury." (R. 303). Upon discharge three days later, he was stable and non-suicidal. Doctors planned to follow up with him in one week and the surgery department would see him about any injury to the tendons in his left wrist from the cutting. (R. 302). A CT scan of Plaintiff's cervical spine and head showed no acute injury. (R. 303).

On March 25, 2010, Plaintiff was admitted to the Partial Hospitalization Program at Virginia Beach Psychiatric Center. (R. 314). In the record there, Mark T. Schreiber, M.D., the attending physician, recounted Plaintiff's history of detoxing at Norfolk General Hospital and alcohol dependence. A physical examination revealed that Plaintiff was "well developed, well nourished . . . and in no acute distress." (R. 321). His ability to shrug his shoulders and move his head to each side was classified as normal. (R. 322). Plaintiff denied any ongoing physical problems and stated that he felt well. (R. 320). A mental status examination revealed that Plaintiff's speech and psychomotor activity were reduced; his mood and affect were somewhat anxious and depressed; he had no hallucinations, delusions, or ideas of reference or control; there was no thought, plan, or intent to harm himself or others; he was not a danger to himself or others; there was no evidence of a formal thought disorder; and his intellectual functioning was average. (R. 314–15).

Dr. Schreiber noted that Plaintiff was intelligent, in good physical health, and cooperative and motivated for treatment, but also a "frequent relapser." (R. 315). Admission diagnoses included: alcohol dependence; major depression, recurrent, severe with suicidal features; generalized anxiety disorder; and a GAF of 40-50, although his highest GAF in the past year was a 70-80. (R. 315). Upon his discharge, Dr. Schreiber noted Plaintiff was less anxious and

depressed, more focused, cheerful, optimistic and bright, and doing well with groups and meetings. (R. 316). Plaintiff returned to Tidewater to see Robert Daniel, Ph.D. on April 6, 2010 and later attended group therapy sessions there. See (R. 323–27). Plaintiff was laid off from his job at Norfolk Marine sometime in March 2010. (R. 51).

On April 29, 2010, Dr. Camp signed another note addressed "to whom it may concern," in which Dr. Camp opined that Plaintiff was unable then, "or in the future, to perform his duties at work. He is deemed totally disabled." (R. 395). Dr. Camp noted that Dr. Sheldon Cohn surgically repaired Plaintiff's right shoulder in 2006 and stated that "[a]lthough post-op range of motion improved somewhat, it is still limited precluding active physical use. His left shoulder remains compromised with limited abduction secondary, in part, to significant pain, but, also to structural abnormalities." Id. Dr. Camp wrote that there may be a need for "surgical intervention to prevent a frozen shoulder," but he did not indicate any consultations with Dr. Cohn regarding Plaintiff's rotator cuff injuries.

Dr. Camp performed another physical examination of Plaintiff on May 3, 2011. (R. 393). In his report, Dr. Camp found that Plaintiff had degenerative joint disease, lumbar-disc degeneration, and sacroiliac joint pain. Id. He noted that Plaintiff had weakness and muscle loss in his biceps and triceps, as well as limited abduction of both shoulders. Id. Dr. Camp also noted that, upon performing a straight leg raise test, Plaintiff reported pain at 40 degrees bilaterally. Id.

From April 2010 through June 2011, Plaintiff continued to see Dr. Light at Hampton Roads Behavioral Health, P.C. See (R. 332–61). On June 1, 2010, Dr. Light assessed a GAF of 55 and noted that Plaintiff's compliance with treatment was good. (R. 345). On August 16, 2010 and September 13, 2010, Dr. Light assessed a GAF of 60 and noted that Plaintiff's compliance was good. (R. 353, 357). On October 19, 2010, Dr. Light assessed a GAF of 65. (R. 361). On

November 11, 2010, Dr. Light assessed a GAF of 65 and noted that Plaintiff's compliance and progress toward specific goals was good. (R. 339). On February 3, 2011, March 17, 2011, April 28, 2011, and May 19, 2011, Dr. Light assessed a GAF of 65 and again noted that Plaintiff's compliance was good. (R. 332, 334–36). Dr. Light's assessments remained the same through June 16, 2011. (R. 337–38).

On October 22, 2010, Plaintiff completed a function report. (R. 195). Plaintiff reported letting the dog out, walking around the block, dusting, watching television, reading, and preparing his own lunch daily. (R. 188–90, 192). He also changed the cat litter, took the garbage out twice a week, and did laundry once a week. Id. Plaintiff further noted that he watched his grandchildren while their mother worked. (R. 189). He checked the boxes to indicate that his injuries affected the following activities: lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, and concentration. (R. 193). Plaintiff also indicated that he used a cane. (R. 194).

On January 16, 2011, Dr. Camp, Plaintiff's primary treating physician, completed Plaintiff's counsel's "Multiple Impairment Questionnaire." (R. 363-70). He listed three diagnoses: bilateral rotator cuff tears with chronic pain and reduced range of motion, hepatitis C with hepatitis cirrhosis, and anxiety/depression. (R. 363). Dr. Camp asserted that the rotator cuffs limited Plaintiff's abduction of both upper extremities, and that his increased abdominal girth with some ascites caused by hepatic disease limited Plaintiff's stooping, bending, and sitting. (R. 363). Additionally, Dr. Camp noted that Plaintiff was unable to abduct his shoulders to 90 degrees, use repetitive motion with the upper extremities, or lift more than ten pounds due to pain. (R. 364). Dr. Camp found that Plaintiff could sit for three hours and stand/walk for one hour in an eight-hour day, and that he should get up and move around every hour. (R. 365). He rated Plaintiff's pain as moderately severe to severe and rated his fatigue as moderately severe.

(R. 265). Dr. Camp also found that Plaintiff could lift or carry five to ten pounds occasionally but could never lift or carry ten to twenty pounds; that he had significant limitations in doing repetitive reaching, handling, fingering, or lifting; and that he had marked limitations/was essentially precluded from grasping, turning, or twisting objects, using his fingers/hands for fine manipulations, and using his arms for reaching, including overhead. (R. 366–67). Dr. Camp concluded that Plaintiff could not do a full-time competitive job that required activity on a sustained basis and that he would experience pain, fatigue, or other symptoms severe enough to frequently interfere with attention and concentration. (R. 368). Moreover, Dr. Camp concluded that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations, and that he was incapable of even low-stress work. (R. 368). Dr. Camp also indicated that in a job setting, Plaintiff would need to avoid wetness, temperature extremes, and heights, and that he could do no pushing, pulling, kneeling, bending, or stooping. (R. 369). Despite these lofty conclusions, Dr. Camp did not reference any objective medical evidence, such as X-rays, CT scans, and MRIs, and he did not cite any support from a specialist, such as an orthopedist.

From February 3, 2011 to June 16, 2011, Dr. Light regularly met with Plaintiff and filled out reports on his progress coping with depression and alcohol dependence. (R. 332-337). These reports indicate that, during this period, Plaintiff complied with his treatment plan and did not relapse. Id.

On May 3, 2011, Dr. Camp conducted a physical examination of Plaintiff. (R. 393). Dr. Camp found that Plaintiff had limited abduction in both shoulders with biceps/triceps weakness and muscle loss, paraspinal muscle spasm, and a straight-leg raising test that was positive at 45 degrees. He doubted that Plaintiff would be capable of performing work requiring repetitive use of the upper/lower extremities. Id. Dr. Camp also wrote a letter on July 5, 2011 opining on Plaintiff's ability to work. (R. 392). After describing Plaintiff's rotator cuff injuries and liver

8

problems, Dr. Camp asserted:

> In short then, [Plaintiff] has done everything in his power to get back to work: Surgically, grueling physical therapy, job modification and, yes even taking periodic over the counter NSAIDS (by his own choice) despite their potential hepatotoxic effects with his underlying Hepatitis C. Something I, as his physician, cannot condone. Despite all of this, he has been told <u>by his employers</u> that he is not <u>physically</u> capable of fulfilling his duties. As his physical, condition is <u>not</u> expected to improve, but, rather, worsen with time and as there is no cure or stabilizing treatment, I, as the patient's physician, consider him <u>permanently</u> disabled.

(R. 392) (emphasis in original). On an accompanying report, Dr. Camp indicated that "[d]rug and/or alcohol use [was] not a material cause of [Plaintiff's] disability." (R. 391). Dr. Camp also explained that his conclusion was made because Plaintiff's "use of drug and/or alcohol is insignificant and has no impact on his disability." (R. 391).

It appears that Plaintiff worked as a delivery driver for a thrift store in Norfolk for three days in May 2011. (R. 229). Plaintiff also worked for Ocean Marina doing fiberglass repair and painting for one week in June 2011. (R. 229). Plaintiff testified that he was "let go" from both of these jobs because of his physical inability to perform the requisite duties. (R. 51).

In August 2011, Plaintiff completed another function report. (R. 211). He reported watching his grandchildren, letting the dog out daily, driving, making his own lunch, doing laundry once per week, and cleaning the house every three days. (R. 205–06). He could not perform yard work though, because it was "hard on [his] knees." (R. 207). He also blamed his knees for limiting his abilities. (R. 209) ("My knees effect [sic] everything."). Plaintiff again indicated that he used a cane. (R. 210). In addition to the boxes he checked in October 2010, Plaintiff additionally indicated that his injuries affected his sitting, talking, hearing, seeing, completing tasks, and getting along with others. (R. 209); cf. (R. 193).

Ten days later, Plaintiff completed a third function report. (R. 219). It was almost entirely the same as the previous one. He stated, "yard work is to [sic] bad on feet, legs, knees [and]

9

arms." (R. 215). This time, however, Plaintiff did not check the boxes to indicate that his injuries affected his hearing, talking, seeing, or ability to get along with others. (R. 217). He also indicated that he "hardly ever" used his cane. (R. 218).

## II. PROCEDURAL HISTORY

### A. Application for Disability Insurance Benefits

Plaintiff applied for Disability Insurance Benefits ("DIB") on September 20, 2010, alleging that he was disabled as of March 23, 2010. (R. 144). On March 3, 2011, Leopold Moreno, M.D., a state agency medical consultant, reviewed Plaintiff's claim and completed a physical residual functioning capacity ("RFC") assessment based upon the record before him. (R. 75). Dr. Moreno reported that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull without limitation "other than shown" for his ability to lift and/or carry. (R. 75). On March 7, 2011, David Deaver, Ph.D., a state agency psychological consultant, completed a mental RFC assessment based upon his review of the record. (R. 76–77). Dr. Deaver found that Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain concentration, perform within a schedule, and get along with co-workers. Id. On March 9, 2011, the Commissioner denied Plaintiff's application. (R. 82).

Plaintiff filed for reconsideration on April 18, 2011. (R. 97). On September 7, 2011, Ralph Hellams, M.D., a state agency medical consultant, reviewed Plaintiff's claim and completed a physical residual functioning capacity assessment based upon the record before him. (R. 90–91). Like Dr. Moreno, Dr. Hellams determined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push

and/or pull without limitation "other than shown" for his ability to lift and/or carry. (R. 90). On September 9, 2011, Alan D. Entin, Ph.D., a state agency psychological consultant, completed a mental RFC assessment based upon his review of the record. (R. 91-93). Like Dr. Deaver, Dr. Entin found that Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain concentration, perform within a schedule, and get along with co-workers. Id. The Commissioner again denied Plaintiff's application. Plaintiff subsequently requested an administrative hearing.

### B. ALJ Hearing

On August 2, 2012, Administrative Law Judge ("ALJ") Jeffrey M Jordan held a hearing to review Plaintiff's disability claim. (R. 48). Before the ALJ, Plaintiff testified that a large portion of his daily pain derives from his Hepatitis C. (R. 61). Plaintiff reported constant pain on his "left side, where the liver is." (R. 61). Plaintiff rated the liver pain at six to seven on a ten point scale, and he rated his shoulder pain about five to six with medication. (R. 61). Plaintiff testified that he did a little bit of cooking and helped out with the laundry. (R. 52). He stated he was able to drive, but rarely did. He testified that he could not stand for long periods of time, but he had no problems sitting for long periods of time. (R. 53). He stated that he could walk about one half of a city block before having to stop and rest, and could lift or carry at most ten to fifteen pounds. (R. 53).

A vocational expert ("VE") also testified before the ALJ. The VE classified Plaintiff's past fiberglass work and boat rigging work as medium and semi-skilled. (R. 62). He classified Plaintiff's boat building and repairing work as medium and skilled. Id. The VE classified his dredging and dock building work as heavy and skilled. Id.

The VE testified that a hypothetical individual with Plaintiff's vocational profile[2] could not perform Plaintiff's past relevant work. The VE testified that such an individual could though perform the light unskilled jobs of unarmed security guard, office helper, and mail clerk, which exist in significant numbers in the national economy. (R. 63–64). The VE also testified that these jobs exist in reduced, but significant numbers with an added fifteen to thirty-minute sit/stand option. (R. 64–65). However, the VE testified that if Plaintiff's testimony before the ALJ was taken as fully credible, then he would not be able to perform any work in the national economy. (R. 65). The VE also testified that the hypothetical individual described by the ALJ would be precluded from any jobs involving detailed instructions. (R. 67).

On August 31, 2012, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act and denied his claim. (R. 43).

### C. Post Hearing

Plaintiff appealed to the Appeals Council. In support of his claim, Plaintiff submitted a completed questionnaire and letter from Dr. Prakash G. Ettigi, a psychiatrist, and another letter from Dr. Camp.[3] In the questionnaire, dated April 22, 2013, Dr. Ettigi indicated that he first treated Plaintiff on April 3, 2013. (R. 7). Dr. Ettigi assessed Plaintiff a GAF of 50, indicating "serious symptoms," and noted his lowest GAF for the past year was 45. Id. He diagnosed Patient's condition as "Major Depression Recurrent, PTSD, Alcoholism," and found that Plaintiff was incapable of even low stress work and would miss work more than three times per month. (R. 7, 13–14). Dr. Ettigi also indicated that, in his best medical opinion, the symptoms

---

[2] A person who could lift/carry and push/pull up to twenty pounds occasionally and ten pounds frequently from waist to chest level; would need to avoid overhead work activity; could stand and walk for 6 hours within an eight-hour workday; could sit for six hours within an eight-hour workday; should avoid climbing ladders, ropes, and scaffolds; should avoid crawling; could perform other postural movements occasionally; should avoid constant fingering, handling, grasping, and reaching; would be limited to simple routine, low-stress (defined as avoid production-quota work and minimal changes in the work routine and minimal decision-making); and would be limited to brief superficial contact with the public and coworkers.

[3] Dr. Camp's letter, dated October 23, 2012, mimics the opinions in his first three letters.

and limitations he described in Plaintiff's questionnaire began in March 2010. (R. 14). In his letter, also dated April 22, 2013, Dr. Ettigi recounted Plaintiff's medical history and summarized his diagnosis from the questionnaire. (R. 15–17). The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (R. 1).

Pursuant to 42 U.S.C. § 405(g), Plaintiff timely filed this action seeking judicial review of the Commissioner's final decision. Plaintiff filed his Motion for Summary Judgment and Motion for Remand on May 28, 2014. ECF Nos. 8, 9. Defendant filed her Motion for Summary Judgment on Jun 26, 2014. ECF No. 11. The matter was then referred to United States Magistrate Judge Douglas E. Miller pursuant to: (1) 28 U.S.C. § 636(b)(1)(B) and (C); (2) Rule 72(b) of the Federal Rules of Civil Procedure; (3) Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. Judge Miller issued his Report and Recommendation ("R&R") with respect to the parties' opposing motions on November 7, 2014. ECF No. 13. The R&R recommends that this Court DENY Plaintiff's Motion for Summary Judgment and Motion for Remand, GRANT the Commissioner's Motion for Summary Judgment, and AFFIRM the final decision of the Commissioner. Plaintiff filed his objections to the R&R on November 19, 2014. ECF No. 14. Defendant responded on December 3, 2014. ECF No. 15.

### III. PLAINTIFF WAIVED REVIEW BY FAILING TO FILE SPECIFIC AND PARTICULARIZED OBJECTIONS.

Within fourteen days after being served with a copy of the magistrate judge's proposed findings and recommendations, "any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C.A. § 636(b)(2).

If such objections are filed, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." If a party fails to timely object to the magistrate judge's report, it waives its right of review. United States v. Midgette, 478 F.3d 616, 621 (4th Cir. 2007).

The purpose of magistrate review is to conserve judicial resources. Id. at 622. In order to preserve the district court's role as the primary supervisor of magistrate judges, parties may raise objections with the magistrate judge's report. Id. at 621. However, the objection requirement is designed to allow the district court to "focus on specific issues, not the report as a whole." Id. Therefore, objections must be specific and particularized. Id. "A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object." Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003). Likewise, a mere restatement of the arguments raised in the summary judgment filings does not constitute an "objection" for the purposes of district court review. Abou-Hussein v. Mabus, No. 2:09-1988-RMG-BM, 2010 WL 4340935, at *1 (D.S.C. Oct. 28, 2010) aff'd, 414 F. App'x 518 (4th Cir. 2011); See Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 509 (6th Cir. 1991).[4]

In the instant case, Plaintiff's objections amount to nothing more than a rehashing of the arguments raised in his Motion for Summary Judgment. Plaintiff argued the following in support of summary judgment:

> (1) The ALJ failed to properly weigh the medical evidence on Mr. Nichols' physical residual functional capacity.

---

[4] "A general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error. We should not permit appellants to do the same to the district court reviewing the magistrate's report." Howard, 932 F.2d at 509 (6th Cir. 1991) (citing Thomas v. Arn, 474 U.S. 140, 147 (1985)).

14

(2) The ALJ failed to properly evaluate Mr. Nichols' credibility.

(3) The ALJ relied on flawed vocational expert testimony.

(4) Remand is warranted based on new evidence before the Appeals Council.

ECF No. 10 at 12, 17, 18, 20. Following the release of Judge Miller's report, Plaintiff objects to:

(1) The magistrate judge's finding that the ALJ properly weighed the medical evidence and appropriately determined Mr. Nichols' residual functional capacity.

(2) The magistrate judge's finding that the ALJ properly evaluated Mr. Nichols' credibility.

(3) The magistrate judge's finding that the ALJ relied on appropriate testimony from the vocational expert,

(4) The magistrate judge's finding that remand is not warranted based on new and material evidence before the Appeals Council.

ECF No. 14 at 1–2. Quite simply, Plaintiff objects to all of Judge Miller's findings. To make matters worse, the brief outlining Plaintiff's objections is largely a summary, and at times a direct copy, of the memorandum he submitted to Judge Miller.[5] Plaintiff has failed to guide the Court towards specific issues needing resolution, instead asking the Court to review the case as a whole. To comply with this request would be to negate the entire purpose of magistrate judge review. Because Plaintiff failed to make specific and particularized objections, the Court finds *de novo* review unnecessary. See Howard, 932 F.2d at 509 (6th Cir. 1991).

## IV. CONCLUSION

Having reviewed the R&R and Plaintiff's objections, the Court: (1) **ACCEPTS** the R&R, ECF No. 13; (2) **AFFIRMS** the decision of the Commissioner of the Social Security Administration; (3) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 8; (4) **DENIES** Plaintiff's Motion for Remand, ECF No. 9; and (5) **GRANTS** Defendant's Motion

---

[5] For example, page 14 of the memorandum Plaintiff submitted to Judge Miller and page 3 of his Objections are nearly identical.

for Summary Judgment, ECF No. 11.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

_____
UNITED STATES DISTRICT JUDGE

Norfolk, VA
March 13, 2015